NEWPORT NEWS SHIPBUILDING & DRY DOCK CO. *v.*
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

No. 82–411.   Argued April 27, 1983—Decided June 20, 1983

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which POWELL, J., joined, *post*, p. 685.

*Andrew M. Kramer* argued the cause for petitioner. With him on the briefs were *Gerald D. Skoning* and *Deborah Crandall.*

*Harriet S. Shapiro* argued the cause for respondent. With her on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Philip B. Sklover,* and *Vella M. Fink.**

JUSTICE STEVENS delivered the opinion of the Court.

In 1978 Congress decided to overrule our decision in *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976), by amending Title VII of the Civil Rights Act of 1964 "to prohibit sex discrimination on the basis of pregnancy."[1] On the effective

---

*Briefs of *amici curiae* urging reversal were filed by *Stephen A. Bokat* and *Cynthia Wicker* for the Chamber of Commerce of the United States; by *Frederick T. Shea, Robert H. McRoberts, Sr., John F. Gibbons,* and *Thomas C. Walsh* for Emerson Electric Co.; by *Benjamin W. Boley* and *Michael S. Giannotto* for the National Railway Labor Conference; and by *Robert E. Williams, Douglas S. McDowell,* and *Lorence L. Kessler* for the Equal Employment Advisory Council.

Briefs of *amici curiae* urging affirmance were filed by *Lawrence B. Trygstad* and *Richard J. Schwab* for the United Teachers-Los Angeles; by *Judith L. Lichtman* and *Judith E. Schaeffer* for the American Association of University Women et al.; and by *J. Albert Woll, Marsha S. Berzon, Laurence Gold, Bernard Kleiman, Carl Frankel, Carole W. Wilson,* and *Winn Newman* for the American Federation of Labor and Congress of Industrial Organizations et al.

[1] Pub. L. 95–555, 92 Stat. 2076 (quoting title of 1978 Act). The new statute (the Pregnancy Discrimination Act) amended the "Definitions" sec-

date of the Act, petitioner amended its health insurance plan to provide its female employees with hospitalization benefits for pregnancy-related conditions to the same extent as for other medical conditions.[2] The plan continued, however, to provide less favorable pregnancy benefits for spouses of male employees. The question presented is whether the amended plan complies with the amended statute.

Petitioner's plan provides hospitalization and medical-surgical coverage for a defined category of employees[3] and a defined category of dependents. Dependents covered by the plan include employees' spouses, unmarried children between 14 days and 19 years of age, and some older dependent children.[4] Prior to April 29, 1979, the scope of the plan's coverage for eligible dependents was identical to its coverage for employees.[5] All covered males, whether employees or

---

tion of Title VII, 42 U. S. C. § 2000e, to add a new subsection (k) reading in pertinent part as follows:

"The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. . . ." § 2000e(k) (1976 ed., Supp. V).

[2] The amendment to Title VII became effective on the date of its enactment, October 31, 1978, but its requirements did not apply to any then-existing fringe benefit program until 180 days after enactment—April 29, 1979. 92 Stat. 2076. The amendment to petitioner's plan became effective on April 29, 1979.

[3] On the first day following three months of continuous service, every active, full-time, production, maintenance, technical, and clerical area bargaining unit employee becomes a plan participant. App. to Pet. for Cert. 29a.

[4] For example, unmarried children up to age 23 who are full-time college students solely dependent on an employee and certain mentally or physically handicapped children are also covered. Id., at 30a.

[5] An amount payable under the plan for medical expenses incurred by a dependent does, however, take into account any amounts payable for those expenses by other group insurance plans. An employee's personal cover-

dependents, were treated alike for purposes of hospitalization coverage. All covered females, whether employees or dependents, also were treated alike. Moreover, with one relevant exception, the coverage for males and females was identical. The exception was a limitation on hospital coverage for pregnancy that did not apply to any other hospital confinement.[6]

After the plan was amended in 1979, it provided the same hospitalization coverage for male and female employees themselves for all medical conditions, but it differentiated between female employees and spouses of male employees in its provision of pregnancy-related benefits.[7] In a booklet describing the plan, petitioner explained the amendment that gave rise to this litigation in this way:

"B. Effective April 29, 1979, maternity benefits for female employees will be paid the same as any other hospital confinement as described in question 16. This applies only to deliveries beginning on April 29, 1979 and thereafter.

"C. Maternity benefits for the wife of a male employee will continue to be paid as described in part 'A' of this question." App. to Pet. for Cert. 37a.

---

age is not affected by his or her spouse's participation in a group health plan. *Id.*, at 34a–36a.

[6] For hospitalization caused by uncomplicated pregnancy, petitioner's plan paid 100% of the reasonable and customary physicians' charges for delivery and anesthesiology, and up to $500 of other hospital charges. For all other hospital confinement, the plan paid in full for a semiprivate room for up to 120 days and for surgical procedures; covered the first $750 of reasonable and customary charges for hospital services (including general nursing care, X-ray examinations, and drugs) and other necessary services during hospitalization; and paid 80% of the charges exceeding $750 for such services up to a maximum of 120 days. *Id.*, at 31a–32a (question 16); see *id.*, at 44a–45a (same differentiation for coverage after the employee's termination).

[7] Thus, as the Equal Employment Opportunity Commission found after its investigation, "the record reveals that the present disparate impact on male employees had its genesis in the gender-based distinction accorded to female employees in the past." App. 37.

In turn, Part A stated: "The Basic Plan pays up to $500 of the hospital charges and 100% of reasonable and customary for delivery and anesthesiologist charges." *Ibid.* As the Court of Appeals observed: "To the extent that the hospital charges in connection with an uncomplicated delivery may exceed $500, therefore, a male employee receives less complete coverage of spousal disabilities than does a female employee." 667 F. 2d 448, 449 (CA4 1982).

After the passage of the Pregnancy Discrimination Act, and before the amendment to petitioner's plan became effective, the Equal Employment Opportunity Commission issued "interpretive guidelines" in the form of questions and answers.[8] Two of those questions, numbers 21 and 22, made it clear that the EEOC would consider petitioner's amended plan unlawful. Number 21 read as follows:

> "21. Q. Must an employer provide health insurance coverage for the medical expenses of pregnancy-related conditions of the spouses of male employees? Of the dependents of all employees?
>
> "A. Where an employer provides no coverage for dependents, the employer is not required to institute such coverage. However, if an employer's insurance program covers the medical expenses of spouses of female employees, then it must equally cover the medical expenses of spouses of male employees, including those arising from pregnancy-related conditions.
>
> "But the insurance does not have to cover the pregnancy-related conditions of non-spouse dependents as long as it excludes the pregnancy-related conditions of

---

[8] Interim interpretive guidelines were published for comment in the Federal Register on March 9, 1979. 44 Fed. Reg. 13278–13281. Final guidelines were published in the Federal Register on April 20, 1979. *Id.*, at 23804–23808. The EEOC explained: "It is the Commission's desire . . . that all interested parties be made aware of EEOC's view of their rights and obligations in advance of April 29, 1979, so that they may be in compliance by that date." *Id.*, at 23804. The questions and answers are reprinted as an appendix to 29 CFR § 1604 (1982).

such non-spouse dependents of male and female employees equally." 44 Fed. Reg. 23807 (Apr. 20, 1979).[9]

On September 20, 1979, one of petitioner's male employees filed a charge with the EEOC alleging that petitioner had unlawfully refused to provide full insurance coverage for his wife's hospitalization caused by pregnancy; a month later the United Steelworkers filed a similar charge on behalf of other individuals. App. 15–18. Petitioner then commenced an action in the United States District Court for the Eastern District of Virginia, challenging the Commission's guidelines and seeking both declaratory and injunctive relief. The complaint named the EEOC, the male employee, and the United Steelworkers of America as defendants. *Id.*, at 5–14. Later the EEOC filed a civil action against petitioner alleging discrimination on the basis of sex against male employees in the company's provision of hospitalization benefits. *Id.*, at 28–31. Concluding that the benefits of the new Act extended only to female employees, and not to spouses of male employees, the District Court held that petitioner's plan was lawful and enjoined enforcement of the EEOC guidelines relating to pregnancy benefits for employees' spouses. 510

---

[9] Question 22 is equally clear. It reads:

"22. Q. Must an employer provide the same level of health insurance coverage for the pregnancy-related medical conditions of the spouses of male employees as it provides for its female employees?

"A. No. It is not necessary to provide the same level of coverage for the pregnancy-related medical conditions of spouses of male employees as for female employees. However, where the employer provides coverage for the medical conditions of the spouses of its employees, then the level of coverage for pregnancy-related medical conditions of the spouses of male employees must be the same as the level of coverage for all other medical conditions of the spouses of female employees. For example, if the employer covers employees for 100 percent of reasonable and customary expenses sustained for a medical condition, but only covers dependent spouses for 50 percent of reasonable and customary expenses for their medical conditions, the pregnancy-related expenses of the male employee's spouse must be covered at the 50 percent level." 44 Fed. Reg., at 23807–23808.

F. Supp. 66 (1981). It also dismissed the EEOC's complaint. App. to Pet. for Cert. 21a. The two cases were consolidated on appeal.

A divided panel of the United States Court of Appeals for the Fourth Circuit reversed, reasoning that since "the company's health insurance plan contains a distinction based on pregnancy that results in less complete medical coverage for male employees with spouses than for female employees with spouses, it is impermissible under the statute." 667 F. 2d, at 451. After rehearing the case en banc, the court reaffirmed the conclusion of the panel over the dissent of three judges who believed the statute was intended to protect female employees "in their ability or inability to work," and not to protect spouses of male employees. 682 F. 2d 113 (1982). Because the important question presented by the case had been decided differently by the United States Court of Appeals for the Ninth Circuit, *EEOC* v. *Lockheed Missiles & Space Co.*, 680 F. 2d 1243 (1982), we granted certiorari. 459 U. S. 1069 (1982).[10]

Ultimately the question we must decide is whether petitioner has discriminated against its male employees with respect to their compensation, terms, conditions, or privileges of employment because of their sex within the meaning of § 703(a)(1) of Title VII.[11] Although the Pregnancy Dis-

_____

[10] Subsequently the Court of Appeals for the Seventh Circuit agreed with the Ninth Circuit. *EEOC* v. *Joslyn Mfg. & Supply Co.*, 706 F. 2d 1469 (1983).

[11] Section 703(a), 42 U. S. C. § 2000e–2(a), provides in pertinent part: "It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

Although the 1978 Act makes clear that this language should be construed to prohibit discrimination against a female employee on the basis of her own pregnancy, it did not remove or limit Title VII's prohibition of discrimination on the basis of the sex of the employee—male or female—which

crimination Act has clarified the meaning of certain terms in this section, neither that Act nor the underlying statute contains a definition of the word "discriminate." In order to decide whether petitioner's plan discriminates against male employees because of *their* sex, we must therefore go beyond the bare statutory language. Accordingly, we shall consider whether Congress, by enacting the Pregnancy Discrimination Act, not only overturned the specific holding in *General Electric Co. v. Gilbert*, 429 U. S. 125 (1976), but also rejected the test of discrimination employed by the Court in that case. We believe it did. Under the proper test petitioner's plan is unlawful, because the protection it affords to married male employees is less comprehensive than the protection it affords to married female employees.

I

At issue in *General Electric Co. v. Gilbert* was the legality of a disability plan that provided the company's employees with weekly compensation during periods of disability resulting from nonoccupational causes. Because the plan excluded disabilities arising from pregnancy, the District Court and the Court of Appeals concluded that it discriminated against female employees because of their sex. This Court reversed.

After noting that Title VII does not define the term "discrimination," the Court applied an analysis derived from cases construing the Equal Protection Clause of the Fourteenth Amendment to the Constitution. *Id.*, at 133. The *Gilbert* opinion quoted at length from a footnote in *Geduldig v. Aiello*, 417 U. S. 484 (1974), a case which had upheld the constitutionality of excluding pregnancy coverage under California's disability insurance plan.[12] "Since it is a finding of

was already present in the Act. As we explain *infra*, at 682–685, petitioner's plan discriminates against male employees on the basis of their sex.

[12] " 'While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed* [v. *Reed*, 404 U. S. 71

sex-based discrimination that must trigger, in a case such as this, the finding of an unlawful employment practice under § 703(a)(1)," the Court added, *"Geduldig* is precisely in point in its holding that an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." 429 U. S., at 136.

The dissenters in *Gilbert* took issue with the majority's assumption "that the Fourteenth Amendment standard of discrimination is coterminous with that applicable to Title VII." *Id.*, at 154, n. 6 (BRENNAN, J., dissenting); *id.*, at 160–161 (STEVENS, J., dissenting).[13] As a matter of statutory interpretation, the dissenters rejected the Court's holding that the plan's exclusion of disabilities caused by pregnancy did not constitute discrimination based on sex. As JUSTICE BRENNAN explained, it was facially discriminatory for the company to devise "a policy that, but for pregnancy, offers protection for all risks, even those that are 'unique to' men or

-----

(1971)], and *Frontiero* [v. *Richardson,* 411 U. S. 677 (1973)]. Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

" 'The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.' [417 U. S.], at 496–497, n. 20." 429 U. S., at 134–135.

The principal emphasis in the text of the *Geduldig* opinion, unlike the quoted footnote, was on the reasonableness of the State's cost justifications for the classification in its insurance program. See n. 13, *infra.*

[13] As the text of the *Geduldig* opinion makes clear, in evaluating the constitutionality of California's insurance program, the Court focused on the "non-invidious" character of the State's legitimate fiscal interest in excluding pregnancy coverage. 417 U. S., at 496. This justification was not relevant to the statutory issue presented in *Gilbert.* See n. 25, *infra.*

heavily male dominated." *Id.*, at 160. It was inaccurate to describe the program as dividing potential recipients into two groups, pregnant women and nonpregnant persons, because insurance programs "deal with future *risks* rather than historic facts." Rather, the appropriate classification was "between persons who face a risk of pregnancy and those who do not." *Id.*, at 161–162, n. 5 (STEVENS, J., dissenting). The company's plan, which was intended to provide employees with protection against the risk of uncompensated unemployment caused by physical disability, discriminated on the basis of sex by giving men protection for all categories of risk but giving women only partial protection. Thus, the dissenters asserted that the statute had been violated because conditions of employment for females were less favorable than for similarly situated males.

When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision. It incorporated a new subsection in the "definitions" applicable "[f]or the purposes of this subchapter." 42 U. S. C. § 2000e (1976 ed., Supp. V). The first clause of the Act states, quite simply: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." § 2000e–(k).[14] The House Report stated: "It is the Committee's view that the dissenting Justices correctly interpreted the Act."[15] Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they "correctly express both the principle and the meaning of title VII."[16]

---

[14] The meaning of the first clause is not limited by the specific language in the second clause, which explains the application of the general principle to women employees.

[15] H. R. Rep. No. 95–948, p. 2 (1978), Legislative History of the Pregnancy Discrimination Act of 1978 (Committee Print prepared for the Senate Committee on Labor and Human Resources), p. 148 (1979) (hereinafter Leg. Hist.).

[16] S. Rep. No. 95–331, pp. 2–3 (1977), Leg. Hist., at 39–40.

Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to reestablish the principles of Title VII law as they had been understood prior to the *Gilbert* decision. Many of them expressly agreed with the views of the dissenting Justices.[17]

As petitioner argues, congressional discussion focused on the needs of female members of the work force rather than spouses of male employees. This does not create a "negative inference" limiting the scope of the Act to the specific problem that motivated its enactment. See *United States* v.

---

[17] *Id.*, at 7–8 ("the bill is merely reestablishing the law as it was understood prior to *Gilbert* by the EEOC and by the lower courts"); H. R. Rep. No. 95–948, *supra*, at 8 (same); 123 Cong. Rec. 10581 (1977) (remarks of Rep. Hawkins) ("H. R. 5055 does not really add anything to title VII as I and, I believe, most of my colleagues in Congress when title VII was enacted in 1964 and amended in 1972, understood the prohibition against sex discrimination in employment. For, it seems only commonsense, that since only women can become pregnant, discrimination against pregnant people is necessarily discrimination against women, and that forbidding discrimination based on sex therefore clearly forbids discrimination based on pregnancy"); *id.*, at 29387 (remarks of Sen. Javits) ("this bill is simply corrective legislation, designed to restore the law with respect to pregnant women employees to the point where it was last year, before the Supreme Court's decision in *Gilbert* . . ."); *id.*, at 29647; *id.*, at 29655 (remarks of Sen. Javits) ("What we are doing is leaving the situation the way it was before the Supreme Court decided the Gilbert case last year"); 124 Cong. Rec. 21436 (1978) (remarks of Rep. Sarasin) ("This bill would restore the interpretation of title VII prior to that decision").

For statements expressly approving the views of the dissenting Justices that pregnancy discrimination is discrimination on the basis of sex, see Leg. Hist., at 18 (remarks of Sen. Bayh, Mar. 18, 1977, 123 Cong. Rec. 8144); 24 (remarks of Rep. Hawkins, Apr. 5, 1977, 123 Cong. Rec. 10582); 67 (remarks of Sen. Javits, Sept. 15, 1977, 123 Cong. Rec. 29387); 73 (remarks of Sen. Bayh, Sept. 16, 1977, 123 Cong. Rec. 29641); 134 (remarks of Sen. Mathias, Sept. 16, 1977, 123 Cong. Rec. 29663–29664); 168 (remarks of Rep. Sarasin, July 18, 1978, 124 Cong. Rec. 21436). See also Discrimination on the Basis of Pregnancy, 1977, Hearings on S. 995 before the Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 1st Sess., 13 (1977) (statement of Sen. Bayh); *id.*, at 37, 51 (statement of Assistant Attorney General for Civil Rights Drew S. Days).

*Turkette*, 452 U. S. 576, 591 (1981). Cf. *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273, 285–296 (1976).[18] Congress apparently assumed that existing plans that included benefits for dependents typically provided no less pregnancy-related coverage for the wives of male employees than they did for female employees.[19] When the question of differential coverage for dependents was addressed in the Senate Report, the Committee indicated that it should be resolved "on the basis of existing title VII principles."[20] The legislative

---

[18] In *McDonald*, the Court held that 42 U. S. C. § 1981, which gives "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," protects whites against discrimination on the basis of race even though the "immediate impetus for the bill was the necessity for further relief of the constitutionally emancipated former Negro slaves." 427 U. S., at 289.

[19] This, of course, was true of petitioner's plan prior to the enactment of the statute. See *supra*, at 672. See S. Rep. No. 95–331, *supra* n. 16, at 6, Leg. Hist., at 43 ("Presumably because plans which provide comprehensive medical coverage for spouses of women employees but not spouses of male employees are rare, we are not aware of any Title VII litigation concerning such plans. It is certainly not this committee's desire to encourage the institution of such plans"); 123 Cong. Rec. 29663 (1977) (remarks of Sen. Cranston); Brief for Respondent 31–33, n. 31.

[20] "Questions were raised in the committee's deliberations regarding how this bill would affect medical coverage for dependents of employees, as opposed to employees themselves. In this context it must be remembered that the basic purpose of this bill is to protect women employees, it does not alter the basic principles of title VII law as regards sex discrimination. Rather, this legislation clarifies the definition of sex discrimination for title VII purposes. Therefore the question in regard to dependents' benefits would be determined on the basis of existing title VII principles." S. Rep. No. 95–331, *supra* n. 16, at 5–6, Leg. Hist., at 42–43.

This statement does not imply that the new statutory definition has no applicability; it merely acknowledges that the new definition does not itself resolve the question.

The dissent quotes extensive excerpts from an exchange on the Senate floor between Senators Hatch and Williams. *Post*, at 692–693. Taken in context, this colloquy clearly deals only with the second clause of the bill, see n. 14, *supra*, and Senator Williams, the principal sponsor of the legislation, addressed only the bill's effect on income maintenance plans. Leg. Hist.,

context makes it clear that Congress was not thereby refer-
ring to the view of Title VII reflected in this Court's *Gilbert*
opinion.   Proponents of the legislation stressed throughout
the debates that Congress had always intended to protect *all*
individuals from sex discrimination in employment—includ-
ing but not limited to pregnant women workers.[21]   Against

---

at 80.   Senator Williams first stated, in response to Senator Hatch: "With
regard to more maintenance plans for pregnancy-related disabilities, I do
not see how this language could be misunderstood."   Upon further inquiry
from Senator Hatch, he replied: "If there is any ambiguity, with regard to
income maintenance plans, I cannot see it."   At the end of the same re-
sponse, he stated: "It is narrowly drawn and would not give any employee
the right to obtain income maintenance as a result of the pregnancy of
someone who is not an employee."   *Ibid.*   These comments, which clearly
limited the scope of Senator Williams' responses, are omitted from the dis-
sent's lengthy quotation, *post*, at 692–693.

Other omitted portions of the colloquy make clear that it was logical to
discuss the pregnancies of employees' spouses in connection with income
maintenance plans.   Senator Hatch asked, "what about the status of a
woman coworker who is not pregnant but rides with a pregnant woman and
cannot get to work once the pregnant female commences her maternity
leave or the employed mother who stays home to nurse her pregnant
daughter?"   Leg. Hist., at 80.   The reference to spouses of male employ-
ees must be understood in light of these hypothetical questions; it seems to
address the situation in which a male employee wishes to take time off from
work because his wife is pregnant.

[21] See, *e. g.*, 123 Cong. Rec. 7539 (1977) (remarks of Sen. Williams) ("the
Court has ignored the congressional intent in enacting title VII of the Civil
Rights Act—that intent was to protect all individuals from unjust employ-
ment discrimination, including pregnant workers"); *id.*, at 29385, 29652.
In light of statements such as these, it would be anomalous to hold that
Congress provided that an employee's pregnancy is sex-based, while a
spouse's pregnancy is gender-neutral.

During the course of the Senate debate on the Pregnancy Discrimination
Act, Senator Bayh and Senator Cranston both expressed the belief that the
new Act would prohibit the exclusion of pregnancy coverage for spouses if
spouses were otherwise fully covered by an insurance plan.   See *id.*, at
29642, 29663.   Because our holding relies on the 1978 legislation only to
the extent that it unequivocally rejected the *Gilbert* decision, and ulti-
mately we rely on our understanding of general Title VII principles, we
attach no more significance to these two statements than to the many other

this background we review the terms of the amended statute to decide whether petitioner has unlawfully discriminated against its male employees.

## II

Section 703(a) makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U. S. C. § 2000e–2(a) (1). Health insurance and other fringe benefits are "compensation, terms, conditions, or privileges of employment." Male as well as female employees are protected against discrimination. Thus, if a private employer were to provide complete health insurance coverage for the dependents of its female employees, and no coverage at all for the dependents of its male employees, it would violate Title VII.[22] Such a

---

comments by both Senators and Congressmen disapproving the Court's reasoning and conclusion in *Gilbert.* See n. 17, *supra.*

[22] Consistently since 1970 the EEOC has considered it unlawful under Title VII for an employer to provide different insurance coverage for spouses of male and female employees. See Guidelines On Discrimination Because of Sex, 29 CFR § 1604.9(d) (1982); Commission Decision No. 70–510, CCH EEOC Decisions (1973) ¶ 6132 (1970) (accident and sickness insurance); Commission Decision No. 70–513, CCH EEOC Decisions (1973) ¶ 6114 (1970) (death benefits to surviving spouse); Commission Decision No. 70–660, CCH EEOC Decisions (1973) ¶ 6133 (1970) (health insurance); Commission Decision No. 71–1100, CCH EEOC Decisions (1973) ¶ 6197 (1970) (group insurance).

Similarly, in our Equal Protection Clause cases we have repeatedly held that, if the spouses of female employees receive less favorable treatment in the provision of benefits, the practice discriminates not only against the spouses but also against the female employees on the basis of sex. *Frontiero* v. *Richardson,* 411 U. S. 677, 688 (1973) (opinion of BRENNAN, J.) (increased quarters allowances and medical and dental benefits); *id.,* at 691 (POWELL, J., concurring in judgment); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 645 (1975) (Social Security benefits for surviving spouses); see also *id.,* at 654–655 (POWELL, J., concurring); *Califano* v. *Goldfarb,* 430

practice would not pass the simple test of Title VII discrimination that we enunciated in *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 711 (1978), for it would treat a male employee with dependents " 'in a manner which but for that person's sex would be different.' "[23]   The same result would be reached even if the magnitude of the discrimination were smaller.   For example, a plan that provided complete hospitalization coverage for the spouses of female employees but did not cover spouses of male employees when they had broken bones would violate Title VII by discriminating against male employees.

Petitioner's practice is just as unlawful.   Its plan provides limited pregnancy-related benefits for employees' wives, and affords more extensive coverage for employees' spouses for all other medical conditions requiring hospitalization.   Thus

U. S. 199, 207–208 (1977) (opinion of BRENNAN, J.) (Social Security benefits for surviving spouses); *Wengler* v. *Druggists Mutual Ins. Co.*, 446 U. S. 142, 147 (1980) (workers' compensation death benefits for surviving spouses).

[23] The *Manhart* case was decided several months before the Pregnancy Discrimination Act was passed.   Although it was not expressly discussed in the legislative history, it set forth some of the "existing title VII principles" on which Congress relied.   Cf. *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–698 (1979).   In *Manhart* the Court struck down the employer's policy of requiring female employees to make larger contributions to its pension fund than male employees, because women as a class tend to live longer than men.

"An employment practice that requires 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and the policy of the Act.   Such a practice does not pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'   It constitutes discrimination and is unlawful unless exempted by the Equal Pay Act of 1963 or some other affirmative justification."   435 U. S., at 711.

The internal quotation was from Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1170 (1971).

the husbands of female employees receive a specified level of hospitalization coverage for all conditions; the wives of male employees receive such coverage except for pregnancy-related conditions.[24]  Although *Gilbert* concluded that an otherwise inclusive plan that singled out pregnancy-related benefits for exclusion was nondiscriminatory on its face, because only women can become pregnant, Congress has unequivocally rejected that reasoning.  The 1978 Act makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions.  Thus petitioner's plan unlawfully gives married male employees a benefit package for their dependents that is less inclusive than the dependency coverage provided to married female employees.

There is no merit to petitioner's argument that the prohibitions of Title VII do not extend to discrimination against pregnant spouses because the statute applies only to discrimination in employment.  A two-step analysis demonstrates the fallacy in this contention.  The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.  And since the sex of the spouse is always the opposite of the sex of the employee, it follows inexorably that discrimination against female spouses in the provision of fringe benefits is also discrimination against male employees.  Cf. *Wengler* v. *Druggists Mutual Ins. Co.*, 446 U. S. 142, 147 (1980).[25]  By

---

[24] This policy is analogous to the exclusion of broken bones for the wives of male employees, except that both employees' wives and employees' husbands may suffer broken bones, but only employees' wives can become pregnant.

[25] See n. 22, *supra*.  This reasoning does not require that a medical insurance plan treat the pregnancies of employees' wives the same as the pregnancies of female employees.  For example, as the EEOC recognizes, see n. 9, *supra* (Question 22), an employer might provide full coverage for employees and no coverage at all for dependents.  Similarly, a disability plan covering employees' children may exclude or limit maternity benefits.  Although the distinction between pregnancy and other conditions is, ac-

making clear that an employer could not discriminate on the basis of an employee's pregnancy, Congress did not erase the original prohibition against discrimination on the basis of an employee's sex.

In short, Congress' rejection of the premises of *General Electric Co. v. Gilbert* forecloses any claim that an insurance program excluding pregnancy coverage for female beneficiaries and providing complete coverage to similarly situated male beneficiaries does not discriminate on the basis of sex. Petitioner's plan is the mirror image of the plan at issue in *Gilbert*. The pregnancy limitation in this case violates Title VII by discriminating against male employees.[26]

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE REHNQUIST, with whom JUSTICE POWELL joins, dissenting.

In *General Electric Co. v. Gilbert*, 429 U. S. 125 (1976), we held that an exclusion of pregnancy from a disability-benefits

---

cording to the 1978 Act, discrimination "on the basis of sex," the exclusion affects male and female *employees* equally since both may have pregnant dependent daughters. The EEOC's guidelines permit differential treatment of the pregnancies of dependents who are not spouses. See 44 Fed. Reg. 23804, 23805, 23807 (1979).

[26] Because the 1978 Act expressly states that exclusion of pregnancy coverage is gender-based discrimination on its face, it eliminates any need to consider the average monetary value of the plan's coverage to male and female employees. Cf. *Gilbert*, 429 U. S., at 137–140.

The cost of providing complete health insurance coverage for the dependents of male employees, including pregnant wives, might exceed the cost of providing such coverage for the dependents of female employees. But although that type of cost differential may properly be analyzed in passing on the constitutionality of a State's health insurance plan, see *Geduldig v. Aiello*, 417 U. S. 484 (1974), no such justification is recognized under Title VII once discrimination has been shown. *Manhart*, 435 U. S., at 716–717; 29 CFR § 1604.9(e) (1982) ("It shall not be a defense under Title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other").

plan is not discrimination "because of [an] individual's . . . sex" within the meaning of Title VII of the Civil Rights Act of 1964, § 703(a)(1), 78 Stat. 255, 42 U. S. C. § 2000e-2(a)(1).[1] In our view, therefore, Title VII was not violated by an employer's disability plan that provided all employees with nonoccupational sickness and accident benefits, but excluded from the plan's coverage disabilities arising from pregnancy. Under our decision in *Gilbert*, petitioner's otherwise inclusive benefits plan that excludes pregnancy benefits for a male employee's spouse clearly would not violate Title VII. For a different result to obtain, *Gilbert* would have to be judicially overruled by this Court or Congress would have to legislatively overrule our decision in its entirety by amending Title VII.

Today, the Court purports to find the latter by relying on the Pregnancy Discrimination Act of 1978, Pub. L. 95–555, 92 Stat. 2076, 42 U. S. C. § 2000e(k) (1976 ed., Supp. V), a statute that plainly speaks only of female employees affected by pregnancy and says nothing about spouses of male employees.[2] Congress, of course, was free to legislatively overrule *Gilbert* in whole or in part, and there is no question but what the Pregnancy Discrimination Act manifests congressional dissatisfaction with the result we reached in *Gilbert*. But I think the Court reads far more into the Pregnancy Discrimination Act than Congress put there, and that therefore it is the Court, and not Congress, which is now overruling *Gilbert*.

---

[1] In *Gilbert* the Court did leave open the possibility of a violation where there is a showing that " 'distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against members of one sex or the other.'" 429 U. S., at 135 (quoting *Geduldig* v. *Aiello*, 417 U. S. 484, 496–497, n. 20 (1974)).

[2] By referring to "female employees," I do not intend to imply that the Pregnancy Discrimination Act does not also apply to "female applicants for employment." I simply use the former reference as a matter of convenience.

In a case presenting a relatively simple question of statutory construction, the Court pays virtually no attention to the language of the Pregnancy Discrimination Act or the legislative history pertaining to that language. The Act provides in relevant part:

> "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. . . ." 42 U. S. C. § 2000e(k) (1976 ed., Supp. V).

The Court recognizes that this provision is merely definitional and that "[u]ltimately the question we must decide is whether petitioner has discriminated against its male employees . . . because of their sex within the meaning of § 703(a)(1)" of Title VII. *Ante*, at 675. Section 703(a)(1) provides in part:

> "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U. S. C. § 2000e–2(a)(1).

It is undisputed that in § 703(a)(1) the word "individual" refers to an employee or applicant for employment. As modified by the first clause of the definitional provision of the Pregnancy Discrimination Act, the proscription in § 703(a)(1) is for discrimination "against any individual . . . *because of such individual's* . . . *pregnancy*, childbirth, or related medi-

cal conditions." This can only be read as referring to the pregnancy of an *employee*.

That this result was not inadvertent on the part of Congress is made very evident by the second clause of the Act, language that the Court essentially ignores in its opinion. When Congress in this clause further explained the proscription it was creating by saying that "women affected by pregnancy . . . shall be treated the same . . . as other persons not so affected but *similar in their ability or inability to work*" it could only have been referring to *female employees*. The Court of Appeals below stands alone in thinking otherwise.[3]

The Court concedes that this is a correct reading of the second clause. *Ante*, at 678, n. 14. Then in an apparent effort to escape the impact of this provision, the Court asserts that "[t]he meaning of the first clause is not limited by the specific language in the second clause." *Ibid.* I do not disagree. But this conclusion does not help the Court, for as explained above, when the definitional provision of the first clause is inserted in § 703(a)(1), it says the very same thing: the proscription added to Title VII applies only to female employees.

The plain language of the Pregnancy Discrimination Act leaves little room for the Court's conclusion that the Act was

---

[3] See *EEOC* v. *Joslyn Mfg. & Supply Co.*, 706 F. 2d 1469, 1476–1477 (CA7 1983); *EEOC* v. *Lockheed Missiles & Space Co.*, 680 F. 2d 1243, 1245 (CA9 1982).

The Court of Appeals' majority, responding to the dissent's reliance on this language, excused the import of the language by saying: "The statutory reference to 'ability or inability to work' denotes disability and does not suggest that the spouse must be an employee of the employer providing the coverage. In fact, the statute says 'as other persons not so affected'; it does not say 'as other *employees* not so affected.'" 667 F. 2d 448, 450–451 (CA4 1982). This conclusion obviously does not comport with a common-sense understanding of the language. The logical explanation for Congress' reference to "persons" rather than "employees" is that Congress intended that the amendment should also apply to applicants for employment.

intended to extend beyond female employees. The Court concedes that "congressional discussion focused on the needs of female members of the work force rather than spouses of male employees." *Ante*, at 679. In fact, the singular focus of discussion on the problems of the *pregnant worker* is striking.

When introducing the Senate Report on the bill that later became the Pregnancy Discrimination Act, its principal sponsor, Senator Williams, explained:

> "Because of the Supreme Court's decision in the *Gilbert* case, this legislation is necessary to provide fundamental protection against sex discrimination for our Nation's 42 million *working women*. This protection will go a long way toward insuring that American women are permitted to assume their rightful place in our Nation's economy.
>
> "In addition to providing protection to *working women* with regard to fringe benefit programs, such as health and disability insurance programs, this legislation will prohibit other employment policies which adversely affect *pregnant workers*." 124 Cong. Rec. 36817 (1978) (emphasis added).[4]

---

[4] Reprinted in a Committee Print prepared for the Senate Committee on Labor and Human Resources, 96th Cong., 2d Sess., Legislative History of the Pregnancy Discrimination Act of 1978, pp. 200–201 (1979) (hereinafter referred to as Leg. Hist.). In the foreword to the official printing of the Act's legislative history, Senator Williams further described the purpose of the Act, saying:

"The Act provides an essential protection for working women. The number of women in the labor force has increased dramatically in recent years. Most of these women are working or seeking work because of the economic need to support themselves or their families. It is expected that this trend of increasing participation by women in the workforce will continue in the future and that an increasing proportion of working women will be those who are mothers. It is essential that these women and their children be fully protected against the harmful effects of unjust employment discrimination on the basis of pregnancy." *Id.*, at III.

As indicated by the examples in the margin,[5] the Congressional Record is overflowing with similar statements by individual Members of Congress expressing their intention to ensure with the Pregnancy Discrimination Act that working women are not treated differently because of pregnancy. Consistent with these views, all three Committee Reports on the bills that led to the Pregnancy Discrimination Act ex-

---

[5] See 123 Cong. Rec. 8145 (1977), Leg. Hist., at 21 (remarks of Sen. Bayh) (bill will "help provide true equality for working women of this Nation"); 123 Cong. Rec. 29385 (1977), Leg. Hist., at 62–63 (remarks of Sen. Williams) ("central purpose of the bill is to require that women workers be treated equally with other employees on the basis of their ability or inability to work"); 124 Cong. Rec. 36818 (1978), Leg. Hist., at 203 (remarks of Sen. Javits) ("bill represents only basic fairness for women employees"); 124 Cong. Rec. 36819 (1978), Leg. Hist., at 204 (remarks of Sen. Stafford) (bill will end "major source of discrimination unjustly afflicting working women in America"); 124 Cong. Rec. 21437 (1978), Leg. Hist., at 172 (remarks of Rep. Green) (bill "will provide rights workingwomen should have had years ago"); 124 Cong. Rec. 21439 (1978), Leg. Hist., at 177 (remarks of Rep. Quie) (bill is "necessary in order for women employees to enjoy equal treatment in fringe benefit programs"); 124 Cong. Rec. 21439 (1978), Leg. Hist., at 178 (remarks of Rep. Akaka) ("bill simply requires that pregnant workers be fairly and equally treated").

See also 123 Cong. Rec. 7541 (1977), Leg. Hist., at 7 (remarks of Sen. Brooke); 123 Cong. Rec. 7541, 29663 (1977), Leg. Hist., at 8, 134 (remarks of Sen. Mathias); 123 Cong. Rec. 29388 (1977), Leg. Hist., at 71 (remarks of Sen. Kennedy); 123 Cong. Rec. 29661 (1977), Leg. Hist., at 126 (remarks of Sen. Biden); 123 Cong. Rec. 29663 (1977), Leg. Hist., at 132 (remarks of Sen. Cranston); 123 Cong. Rec. 29663 (1977), Leg. Hist., at 132 (remarks of Sen. Culver); 124 Cong. Rec. 21439 (1978), Leg. Hist., at 178 (remarks of Rep. Corrada); 124 Cong. Rec. 21435, 38573 (1978), Leg. Hist., at 168, 207 (remarks of Rep. Hawkins); 124 Cong. Rec. 38574 (1978), Leg. Hist., at 208–209 (remarks of Rep. Sarasin); 124 Cong. Rec. 21440 (1978), Leg. Hist., at 180 (remarks of Rep. Chisholm); 124 Cong. Rec. 21440 (1978), Leg. Hist., at 181 (remarks of Rep. LaFalce); 124 Cong. Rec. 21441 (1978), Leg. Hist., at 182 (remarks of Rep. Collins); 124 Cong. Rec. 21441 (1978), Leg. Hist., at 184 (remarks of Rep. Whalen); 124 Cong. Rec. 21442 (1978), Leg. Hist., at 185 (remarks of Rep. Burke); 124 Cong. Rec. 21442 (1978), Leg. Hist., at 185 (remarks of Rep. Tsongas).

pressly state that the Act would require employers to treat pregnant employees the same as "other employees."[6]

The Court tries to avoid the impact of this legislative history by saying that it "does not create a 'negative inference' limiting the scope of the Act to the specific problem that motivated its enactment." *Ante*, at 679. This reasoning might have some force if the legislative history was silent on an arguably related issue. But the legislative history is not silent. The Senate Report provides:

> "Questions were raised in the committee's deliberations regarding how this bill would affect medical coverage for dependents of employees, as opposed to employees themselves. In this context it must be remembered that the basic purpose of this bill is to protect women employees, it does not alter the basic principles of title VII law as regards sex discrimination. . . . [T]he question in regard to dependents' benefits would be determined on the basis of existing title VII principles. . . . *[T]he question of whether an employer who does cover dependents, either with or without additional cost to the employee, may exclude conditions related to pregnancy from that coverage is a different matter.* Presumably because plans which provide comprehensive medical coverage for spouses of women employees but not spouses of male employees are rare, we are not aware of any title VII litigation concerning such plans. It is certainly not this committee's desire to encourage the institution of such plans. If such plans should be instituted in the future, the question would remain whether, under title VII, the affected employees were discriminated against on the

---

[6] See Report of the Senate Committee on Human Resources, S. Rep. No. 95–331 (1977), Leg. Hist., at 38–53; Report of the House Committee on Education and Labor, H. R. Rep. No. 95–948 (1978), Leg. Hist., at 147–164; Report of the Committee of Conference, H. R. Conf. Rep. No. 95–1786 (1978), Leg. Hist., at 194–198.

basis of their sex as regards the extent of coverage for their dependents." S. Rep. No. 95–331, pp. 5–6 (1977), Leg. Hist., at 42–43 (emphasis added).

This plainly disclaims any intention to deal with the issue presented in this case. Where Congress says that it would not want "to encourage" plans such as petitioner's, it cannot plausibly be argued that Congress has intended "to prohibit" such plans. Senator Williams was questioned on this point by Senator Hatch during discussions on the floor and his answers are to the same effect.

"MR. HATCH: . . . The phrase 'women affected by pregnancy, childbirth or related medical conditions,' . . . appears to be overly broad, and is not limited in terms of employment. It does not even require that the person so affected be pregnant.

"*Indeed under the present language of the bill, it is arguable that spouses of male employees are covered by this civil rights amendment. . . .*

"Could the sponsors clarify exactly whom that phrase intends to cover?

. . . . .

"MR. WILLIAMS: . . . I do not see how one can read into this any pregnancy other than that pregnancy that relates to the employee, and if there is any ambiguity, *let it be clear here now that this is very precise. It deals with a woman, a woman who is an employee,* an employee in a work situation where all disabilities are covered under a company plan that provides income maintenance in the event of medical disability; that her particular period of disability, when she cannot work because of childbirth or anything related to childbirth is excluded. . . .

. . . . .

"MR. HATCH: So the Senator is satisfied that, though the committee language I brought up, 'woman

affected by pregnancy' seems to be ambiguous, what it means is that *this act only applies to the particular woman who is actually pregnant, who is an employee and has become pregnant after her employment?*

· · · · ·

"MR. WILLIAMS: *Exactly*." 123 Cong. Rec. 29643–29644 (1977), Leg. Hist., at 80 (emphasis added).[7]

It seems to me that analysis of this case should end here. Under our decision in *General Electric Co.* v. *Gilbert* petitioner's exclusion of pregnancy benefits for male employee's spouses would not offend Title VII. Nothing in the Pregnancy Discrimination Act was intended to reach beyond female employees. Thus, *Gilbert* controls and requires that we reverse the Court of Appeals. But it is here, at what

---

[7] The Court suggests that in this exchange Senator Williams is explaining only that spouses of male employees will not be put on "income maintenance plans" while pregnant. *Ante*, at 680, n. 20. This is utterly illogical. Spouses of employees have no income from the relevant employer to be maintained. Senator Williams clearly says that the Act is limited to female employees and as to such employees it will ensure income maintenance where male employees would receive similar disability benefits. Senator Hatch's final question and Senator Williams' response could not be clearer. The Act was intended to affect *only* pregnant workers. This is exactly what the Senate Report said and Senator Williams confirmed that this is exactly what Congress intended.

The only indications arguably contrary to the views reflected in the Senate Report and the exchange between Senators Hatch and Williams are found in two isolated remarks by Senators Bayh and Cranston. 123 Cong. Rec. 29642, 29663 (1977), Leg. Hist., at 75, 131. These statements, however, concern these two Senators' views concerning Title VII sex discrimination as it existed prior to the Pregnancy Discrimination Act. Their conclusions are completely at odds with our decision in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976), and are not entitled to deference here. We have consistently said: "The views of members of a later Congress, concerning different [unamended] sections of Title VII . . . are entitled to little if any weight. It is the intent of the Congress that enacted [Title VII] in 1964 . . . that controls." *Teamsters* v. *United States*, 431 U. S. 324, 354, n. 39 (1977). See also *Southeastern Community College* v. *Davis*, 442 U. S. 397, 411, n. 11 (1979).

should be the stopping place, that the Court begins. The Court says:

> "Although the Pregnancy Discrimination Act has clarified the meaning of certain terms in this section, neither that Act nor the underlying statute contains a definition of the word 'discriminate.' In order to decide whether petitioner's plan discriminates against male employees because of *their* sex, we must therefore go beyond the bare statutory language. Accordingly, we shall consider whether Congress, by enacting the Pregnancy Discrimination Act, not only overturned the specific holding in *General Electric* v. *Gilbert, supra,* but also rejected the test of discrimination employed by the Court in that case. We believe it did." *Ante,* at 675–676.

It would seem that the Court has refuted its own argument by recognizing that the Pregnancy Discrimination Act only clarifies the meaning of the phrases "because of sex" and "on the basis of sex," and says nothing concerning the definition of the word "discriminate."[8] Instead the Court proceeds to try to explain that while Congress said one thing, it did another.

The crux of the Court's reasoning is that even though the Pregnancy Discrimination Act redefines the phrases "because of sex" and "on the basis of sex" only to include discrimination against female employees affected by pregnancy, Congress also expressed its view that in *Gilbert* "the Supreme Court . . . erroneously interpreted congressional intent." *Ante,* at 679. See also *ante,* at 684. Somehow the Court then concludes that this renders all of *Gilbert* obsolete.

In support of its argument, the Court points to a few passages in congressional Reports and several statements by

---

[8] The Court also concedes at one point that the Senate Report on the Pregnancy Discrimination Act "acknowledges that the new definition [in the Act] does not itself resolve the question" presented in this case. *Ante,* at 680, n. 20.

various Members of the 95th Congress to the effect that the Court in *Gilbert* had, when it construed Title VII, misperceived the intent of the 88th Congress. *Ante,* at 679, n. 17. The Court also points out that "[m]any of [the Members of the 95th Congress] expressly agreed with the views of the dissenting Justices." *Ante,* at 679. Certainly *various Members of Congress* said as much. But the fact remains that *Congress as a body* has not expressed these sweeping views in the Pregnancy Discrimination Act.

Under our decision in *General Electric Co.* v. *Gilbert,* petitioner's exclusion of pregnancy benefits for male employees' spouses would not violate Title VII. Since nothing in the Pregnancy Discrimination Act even arguably reaches beyond female employees affected by pregnancy, *Gilbert* requires that we reverse the Court of Appeals. Because the Court concludes otherwise, I dissent.